### In re Thomas Arthur ANGST and Debra Jean Angst, Debtors.

### Karen Owen, Plaintiff,

### v.

### Thomas Arthur Angst, Defendant.

### Bankruptcy No. 08–41154. Adversary No. 08–4133.

United States Bankruptcy Court, N.D. Ohio.

March 15, 2010.

Nancy E. Yakubek, Warren, OH, for Debtors.

## MEMORANDUM OPINION CONCERNING TRIAL

KAY WOODS, Bankruptcy Judge.

The Court conducted a trial in the instant Adversary Proceeding on February 8, 2010. Plaintiff Karen Owen ("Plaintiff") was represented by Frederick S. Coombs, III, Esquire. Debtor/Defendant Thomas Arthur Angst ("Debtor") was represented by Nancy E. Yakubek, Esquire. The Court received the testimony of Plaintiff, Jeffrey Fife, Rocco Bowell, and Debtor. In addition, Plaintiff proffered the deposition testimony of Anthony J. Vigorito, which the Court will discuss in detail below. The following exhibits were offered and admitted into evidence: Exhibits D, F–1, F–2, F–3, F–4, F–5, F–6, F–7 and F–8.

This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and the general order of reference (General Order No. 84) entered in this district pursuant to 28 U.S.C. § 157(a). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1391(b), 1408, and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The following constitutes the Court's findings of fact and conclusions of law pursuant to

Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I. PROCEDURAL BACKGROUND AND MATTERS

Debtor filed a voluntary petition pursuant to chapter 7 of the Bankruptcy Code on April 24, 2008. On July 22, 2008, Plaintiff timely filed Complaint to Determine Dischargeability of Debt ("Complaint") (Doc. # 1), which sought to exempt from discharge a debt in the amount of $89,351.00 ("Judgment Debt") based on a judgment ("Judgment Entry") against Debtor in Trumbull County Court of Common Pleas ("State Court"), Case No.2004 CV 948, dated May 11, 2005. (Comp.¶ 13.) The State Court action alleged breach of contract and a violation of the Ohio Consumer Sales Practice Act ("OCSPA"). (*Id.* ¶ 12.) [1]

Plaintiff asserts that the Judgment Debt is non-dischargeable under 11 U.S.C. § 523(a)(2)(A) because Debtor:

expressly and impliedly represented, warranted and guaranteed the Plaintiff that [Debtor] was qualified, experienced and able to provide the materials, labor, work and services called for under the contractual arrangement and that he would provide such labor, materials, work and services in a timely and good and workmanlike manner and in accordance with all industry standards and specifications applicable to the renovation of the residence.

(Compl.¶ 8.) Plaintiff further alleges that: (i) she "relied upon such representations by [Debtor] in entering into the contract[,]" (*id.* ¶ 9); and (ii) Debtor's "representations were false[,]" (*id.* ¶ 10).

---

**1.** Plaintiff concedes that the Judgment Entry was obtained without a trial in State Court, but instead was the result of a ruling on a motion for summary judgment and Plaintiff's affidavit of damages. The Judgment Entry does not include any findings of fact regarding fraud; however, Plaintiff argues that by virtue of a reference to unspecified attorney fees in the Judgment Entry, the State Court, of necessity, had to have determined Debtor's fraudulent intent. This specific argument was addressed by the Court in Memorandum Opinion Regarding Plaintiff's Motion for Summary Judgment ("S.J.Opinion") (Doc. # 32) dated August 13, 2009, wherein the Court noted that the Plaintiff's State Court motion for summary judgment failed to reference the OCSPA and appears to have been based solely on breach of contract. (*See* S.J. Op. at 12.) Moreover, contrary to Plaintiff's contention that the inclusion of "attorney fees" in the Judgment Entry demonstrates a finding of fraud, this Court finds that the Judgment Entry actually does *not* include an award of attorney fees. The Judgment Entry grants "judgment ... in the amount of $89,351.00 plus interest, from the date of judgment, court costs and attorney fees." (See Ex. F–8.) Although interest and court costs can be calculated, Plaintiff has no ability to recover any amount of attorney fees because the Judgment Entry is silent on this element and fails to award Plaintiff any amount of attorney fees.

Even if the Judgment Entry could be construed as containing an award of attorney fees, an award of attorney fees, alone, is insufficient for a finding of fraud. *Ellis v. Shear (In re Shear)*, 123 B.R. 247 (Bankr.N.D.Ohio 1991), presents similar facts. In *Ellis*, the plaintiff obtained a state court judgment, after a jury trial, for $35,000.00 plus one-half of her attorney's fees based on unjust enrichment. The bankruptcy court held that collateral estoppel did not apply because:

the jury made no special findings of fact. Its verdict was simply for the amount of $35,000 plus one-half of the plaintiff's attorneys fees based upon the judge's instruction which incorporated none of the components of subsection[ ] 523(a)(2).... [I]t is possible that the jury's verdict was premised, at least to some extent, on the criteria for nondischargeability in subsection[ ] 523(a)(2)(A) ... but these criteria were not developed as issues in that case nor was the determination of these criteria necessary to the jury's verdict for the plaintiff.

*Id.* at 249.

Debtor counters that the Judgment Debt is dischargeable; he argues that he made no misrepresentations to Plaintiff because he was at all times ready, willing and able to perform his obligations under the Contract.

Debtor filed Answer of Defendant (Doc. # 7) on August 26, 2008. After completion of discovery, denial of Plaintiff's Motion for Summary Judgment (Doc. # 25), and a Final Pre-trial on September 29, 2009, this Court issued Trial Order (Doc. # 37) and set this matter for trial beginning February 8, 2010.

### A. Use of Deposition at Trial

Paragraph 6 of the Trial Order provides the procedure for presentation of testimony by deposition rather than through live testimony. This paragraph states, in relevant part, "If either party wants to present testimony by deposition, pursuant to Rule 32(a)(4) of the Federal Rules of Civil Procedure, made applicable by Rule 7032 of the Federal Rules of Bankruptcy Procedure, that party shall...." (Trial Order ¶ 6.) Rule 32, which is titled, "Using Depositions in Court Proceedings," provides for certain limited circumstances when a deposition of a witness, whether or not a party, may be used "for any purpose" at trial. FED. R. CIV. P. 32(a)(4) (West 2009).

On January 7, 2010, Plaintiff filed Notice of Intent to Utilize Deposition Testimony (Doc. # 40), in which Plaintiff stated her intent to read into evidence the entire transcript of the deposition of Anthony J. Vigorito, which was taken before a notary public on December 9, 2009, in connection with this Adversary Proceeding. Mr. Vigorito is the building official for the City of Niles, Ohio, who was responsible for inspecting the construction work performed by Debtor on Plaintiff's residence. The parties concede that Mr. Vigorito: (A) is not dead; (B) is not more than 100 miles from the place of trial; (C) was not prohibited from attending the trial because of age, illness, infirmity or imprisonment; and (D) could have been compelled to attend the trial by subpoena. Neither party made any attempt to demonstrate the existence of exceptional circumstances that would have made it desirable for Mr. Vigorito to testify by way of deposition instead of in person.[2] As a consequence, the Court found and continues to find that Mr. Vigorito is not an "unavailable witness" within the purview of Federal Rule of Civil Procedure 32(a)(4). Notwithstanding the availability of Mr. Vigorito to testify at trial, however, Mr. Coombs and Ms. Yakubek agreed prior to the commencement of the deposition that the transcript could be read into evidence at trial without the necessity of requiring the deponent to appear as a live witness.

The Court permitted the deposition testimony to be read into the record, but specifically deferred ruling whether such testimony would be allowed as evidence, given the availability of Mr. Vigorito to testify. As a consequence, the admission

---

**2.** Neither Plaintiff nor Debtor moved (in writing or orally) for permission to use Mr. Vigorito's deposition testimony based on exceptional circumstances. Rule 32(a)(4)(E) provides: "on motion and notice, that exceptional circumstances make it desirable—in the interest of justice and with due regard to the importance of live testimony in open court—to permit the deposition to be used." Moreover, it is apparent that exceptional circumstances did not exist because, at the conclusion of trial and long after Plaintiff had rested her case, counsel for Plaintiff informed the Court that Mr. Vigorito was available to testify and requested the Court to permit such testimony at that time. The Court denied this request because Plaintiff had previously rested her case without any indication that she would attempt to call Mr. Vigorito as a live witness.

of Mr. Vigorito's testimony is the first matter to be addressed herein.

This Court found limited case law regarding the use of deposition testimony of a non-party witness at trial when such witness is otherwise available to testify. In *Allgeier v. United States,* 909 F.2d 869 (6th Cir.1990), the Sixth Circuit Court of Appeals held that the district court abused its discretion in admitting the deposition testimony of a treating physician because the record did not establish "exceptional circumstances." In the *Allgeier* case, the district court concluded that it was both Kentucky and federal practice to find a doctor to be "automatically unavailable." *Id.* at 876. The Court of Appeals stated,

> How exceptional the circumstances must be under Rule 32(a)(3)(E) [3] is indicated by its companion provisions. These authorize use of a deposition in lieu of live testimony only when the witness is shown to be unavailable or unable to testify because he is dead; at a great distance; aged, ill, infirm, or imprisoned; or unprocurable through a subpoena.

*Id.* Based on the reasoning of *Allgeier,* it appears that it would be an abuse of discretion to permit Mr. Vigorito's deposition testimony to be admitted as evidence at trial.

In the instant case, the parties agreed that Mr. Vigorito's deposition could be read into evidence at trial. The Court found only one case that addressed this issue—*Bobrosky v. Vickers,* 170 F.R.D. 411 (W.D.Va.1997). In that case, the district court relied on Federal Rule of Civil Procedure 29 to permit a doctor to testify by deposition where the parties had stipulated that such deposition could be used as evidence at trial. Depositions of two other physicians, however, were not authorized

to be read into evidence, despite the defendant's argument that an agreement also existed with respect to their use. The district court noted:

> Rule 29 allows the parties, by written stipulation, to modify the procedures for the taking and use of depositions. Thus, where the parties have agreed in writing, the requirements of Rule 32 may be waived. In this way, depositions of witnesses have in many cases been used at trial in lieu of live testimony. In fact, their admission at trial has so often not even been an issue that in most instances courts review depositions as substantive evidence without mentioning the manner in which they became part of the record.

*Id.* at 416.

The *Bobrosky* case has not been cited regarding its reliance on Rule 29. Despite the district court's statement that Rule 29 permits parties to modify the procedures for the taking and *use* of depositions, the Rule, on its face, is not so broad. Rule 29, which is titled, "Stipulations About Discovery Procedure," states, as follows:

> Unless the court orders otherwise, the parties may stipulate that:
>
> (a) a deposition may be taken before any person, at any time or place, on any notice, and in the manner specified—in which event it may be used in the same way as any other deposition; and
>
> (b) other procedures governing or limiting discovery be modified—but a stipulation extending the time for any form of discovery must have court approval if it would interfere with the time set for completing discovery, for hearing a motion, or for trial.

FED.R.CIV.P. 29 (West 2009). Rule 29 provides that parties may stipulate about how and when a deposition may be taken. If

---

**3.** This Rule was renumbered as 32(a)(4)(E) in 2007.

the parties agree, then the deposition "may be used in the same way as any other deposition." *Id.* Rule 29, however, does not expressly state that parties can waive the requirements of Rule 32. Mr. Coombs, without citation to any rule or other authority, represented that, in his experience, a deposition could be used in this district in lieu of live testimony upon the agreement of the parties. Although not expressly authorized, given the dearth of cases on this issue, the "practice" to which Mr. Coombs refers may, indeed, exist for the convenience of the parties.

Since it appears that (i) neither party will be prejudiced by the admission of the deposition testimony of Mr. Vigorito, and (ii) the parties expressly agreed that Mr. Vigorito could testify at trial via deposition, the Court will admit the deposition of Mr. Vigorito (hereinafter the "Building Inspector") as evidence at trial.

## II. FACTUAL BACKGROUND

### A. Pre–Contract Events

The following facts, unless otherwise noted, are taken from trial testimony and admitted exhibits. Plaintiff hired Debtor in 2003 to construct an addition ("Addition") and make other improvements to Plaintiff's residence in Niles, Ohio.[4] At that time, Debtor operated a small construction business under the name Silver Skunk Construction. Debtor and Plaintiff knew each other prior to their contractual relationship because their daughters went to school together. Plaintiff stated they were friends; whereas Debtor simply acknowledged that they knew each other, but said there was nothing special about the relationship. (Trial Tr. February 8, 2010, at 11:41:23.) Plaintiff testified that she took her daughter to Debtor's home for a party hosted by Debtor's daughter. On that occasion, Plaintiff saw some of the remodeling and construction work Debtor had done at his home. At that point, Plaintiff asked Debtor if he would be interested in doing some construction work at her residence.

According to Plaintiff, Debtor told her (i) that he had "been doing construction for quite a while," and (ii) "about other jobs he had done in the past." (Tr. at 10:59:33.) At Plaintiff's request, Debtor also showed Plaintiff a kitchen he had remodeled as another example of his work. Plaintiff testified that she thought everything looked "very nice" and "well-constructed." (Tr. at 11:00:13.) Plaintiff failed, however, to identify any specific representation Debtor made to her about his experience, the quality of his workmanship, or his ability to perform work on the Addition. Instead, Plaintiff testified that, because of their friendship,[5] the friendship between

---

4. Plaintiff testified that the City of Niles required her to repair the back porch on her residence. Plaintiff stated that, since other work needed to be done at her residence, she decided to have the Addition constructed at the same time.

5. Because justifiable reliance is one of the elements of a cause of action under § 523(a)(2)(A), this Court will address Plaintiff's allegations that she relied on the friendship between Debtor and herself, as well as the friendship of their daughters, in contracting with Debtor. Debtor acknowledges that he knew Plaintiff prior to entering into the

Contract for the Addition, but he disputes the characterization of their relationship as being "friends." In *Coman v. Phillips (In re Phillips)*, 804 F.2d 930 (6th Cir.1986), the Sixth Circuit stated:

> A review of the case law indicates that evidence of friendship or a close personal relationship weighs heavily in favor of finding reasonable reliance. The bankruptcy court and district court had held the Comans to an overly stringent legal standard of "reasonableness," which did not take into account the facts that the Comans had known the Phillips for 25 years principally in connection with church-related activities

their daughters, and the examples of Debtor's work that she had seen, Plaintiff relied on Debtor to ensure that the construction was completed according to the Niles City Building Code. (Tr. at 11:01:56.)

The Addition included a family room, garage, and a second floor guest room. Based on the information from Plaintiff, Debtor gave Plaintiff an estimate of $67,800.00 to complete the Addition. Plaintiff accepted this estimate. Plaintiff acknowledged Debtor told her—and she anticipated—that construction of the Addition would take six (6) to twenty-four (24) months to complete. (Tr. at 11:05:30.)

The entire construction contract between Plaintiff and Debtor is evidenced by three hand-written pages ("Contract"), which are not dated or signed by either party. The Contract was attached as Exhibit 1 to Plaintiff's State Court complaint. (*See* Ex. F–1.) Plaintiff testified that the handwriting on the Contract was Debtor's, but she made the arrows and numbers on the Contract to indicate the priority or elimination of certain portions of the project. Plaintiff testified that the number "2" indicated the secondary nature and priority of the specified item and "no" indicated that an item was eliminated from the contracted work. For instance, Plaintiff stated that she eliminated: (i) the spiral staircase because of the cost; (ii) the sidewalk on the side of the Addition because there was insufficient room; and (iii) insulation in the attic, which she anticipated would be a later project.

### B. Payments

The Contract does not contain a specific payment schedule. However, page two of the Contract indicates Plaintiff made, at unknown times, five separate payments to Debtor, or on behalf of construction of the Addition, each of which Debtor acknowledged. Plaintiff made an initial deposit of $10,000.00; thereafter she paid Debtor $23,800.00 ("1st Payment"). Next to the 1st Payment is written: "1st payment for ordering—spiral staircase[,] garage door, siding, windows, replacement windows, doors, trusses and start of construction." (Contract at 2.) Plaintiff testified that she made a payment of $2,516.00 directly to the heating contractor because, when the heating contractor completed its work, Debtor informed her that he had left his checkbook at home and was therefore unable to pay the heating contractor himself.

Debtor acknowledged receiving two more payments of $6,000.00 and $2,500.00, but there was no testimony about the reason for or timing of these payments. Plaintiff did not allege that Debtor made any specific representation to her before or at the time she made these payments.

Plaintiff also stated that she purchased six $1,000.00 Home Depot cards for Debtor to use to purchase materials, one of which she gave to Debtor. (Tr. at 11:11:14.) Debtor testified that he used a Home Depot card to purchase fencing material. (Tr. at 12:04:41.)

### C. Construction on the Addition

Debtor applied for a building permit on

---

and that the Comans had been given no cause to distrust the Phillips' representation.

*Id.* at 933 (internal citations omitted). Plaintiff testified that her daughter and Debtor's daughter were friends; however, Plaintiff's testimony concerning her relationship with Debtor prior to entering into the Contract was limited to one occasion when she took her

daughter to a party at Debtor's house. The friendship Plaintiff described between Debtor and herself was not a particularly close relationship; rather, it was the kind of casual friendly relationship that parents develop with their child's friend's parents. As a consequence, the instant case is distinguishable from the *Phillips* case.

April 10, 2003 (Ex. A[6]), and obtained such permit based on his plans ("Plans") (Ex. B). Although the testimony at trial was less than clear about what work was actually done and when it was performed, there is no dispute that Debtor began construction work at Plaintiff's home, but did not complete the job. Debtor testified that he[7] began work on Plaintiff's residence by digging the foundation and pouring footers. The Building Inspector approved the excavation work before Debtor poured the foundation.[8] (See Ex. C, Field Report dated April 8, 2003; Tr. at 10:05:36.) Debtor testified that he believed he was constructing the Addition according to the Plans. It is undisputed that Debtor made some progress on the Addition. However, Debtor testified that, on several occasions, Plaintiff diverted his attention away from constructing the Addition by requesting his assistance with various side jobs.

Debtor claims that he performed the following "side jobs" at Plaintiff's request: (i) emptying and tearing down a barn, (ii) cleanup of debris from the yard, (iii) cleanup of a boat Plaintiff wanted to sell, (iv) cleanup of a 30–foot camper Plaintiff wanted to sell, (v) the start of erecting a fence around Plaintiff's yard, and (vi) the installation of a rear driveway. (See Ex. F–2, Debtor's State Court Answer.) Plaintiff denied that she requested Debtor's help in cleaning and selling the boat and/or the 30–foot camper.

Debtor testified that Plaintiff paid him for most but not all of the side jobs; when he was not paid up-front for one of the side jobs, he would use money Plaintiff had advanced pursuant to the Contract to complete such side job. Debtor claims that Plaintiff failed to pay him for installation of the driveway. (Tr. 12:02:02.) Plaintiff testified that she did not pay Debtor for installing the fence on her property because the second-half of the fence did not match the first-half. (Tr. 11:17:23.) Debtor testified that although his son began installing the fence, Plaintiff hired someone else who installed the non-matching fence material. Installation of the fence and back driveway are contemplated on page 3 of the Contract under the heading of "Additional Work" and the cost of these projects was not included in Debtor's estimate for the Addition. (See Ex. F–1 at unnumbered 7.)

It appears from Plaintiff's testimony that she became wary of Debtor's activities in constructing the Addition after she made the 1st Payment to Debtor. At the time she made the 1st Payment, Plaintiff testified that Debtor asked her whether she had enough money to keep him busy on a job for the next two years.[9] Thereaf-

---

6. Although Exhibits A, B, and C were not admitted into evidence, the testimony of the Building Inspector, which was discussed previously, included facts contained in these Exhibits.

7. Debtor, at times, received help from his son and/or Jeffrey Fife in constructing the Addition.

8. The Building Inspector completed "Field Reports" after inspections on April 8, 2003, July 16, 2003, November 13, 2003, and November 14, 2003. (Ex. C.)

9. Plaintiff testified that she became even more concerned about Debtor's work on the Addition when, about a week after she made the 1st Payment, Debtor's wife showed up at Plaintiff's residence in a new red car. The only evidence about the new car consisted of Plaintiff's passing reference to it.

Plaintiff's testimony about the red car is nothing but a red herring. Plaintiff offered no evidence whatsoever about this car. In counsel's closing argument, Mr. Coombs stated that the timing of the purchase of the car was "suspicious." However, there was no evidence that either Debtor or his wife pur-

ter, Plaintiff asked Debtor to provide her with receipts for the materials he had purchased, but Debtor did not provide Plaintiff with the requested receipts. Debtor testified that it was not his normal business practice to keep receipts for materials and provide them to his customers. Moreover, the Contract did not require Debtor to provide Plaintiff with any receipts. Despite Plaintiff's alleged concern about not obtaining receipts from Debtor, Plaintiff testified that she did not ask Raub Construction ("Raub") to provide receipts for the materials Raub used to complete work on the Addition.

Plaintiff testified that Debtor never delivered doors, windows and/or siding for the Addition. Debtor testified that he put down a deposit on the windows, but he did not deliver them because he was not yet ready to install the windows. Debtor further testified that the doors and siding had not been purchased because construction had not reached a point where those materials were needed.

The relationship between Plaintiff and Debtor broke down. Debtor testified that he would not continue to work on the Addition unless he was paid for installation of the driveway, and Plaintiff testified that she was unwilling to advance any more money to Debtor until the Addition was completed. As a result of this impasse, Debtor packed up without completing the Addition.

After Debtor stopped work on the Addition, Plaintiff called the Building Inspector and requested that he inspect the Addition, which he did on November 14, 2003 (Ex. C, unnumbered 4). As a result of

that inspection, the Building Inspector itemized twelve violations of the Niles City Building Code. (Ex. D.) There is no dispute that (i) the November 14, 2003, inspection was not a final inspection of a completed project; and (ii) Debtor and Plaintiff agreed that construction work on the Addition could take as long as two years (*i.e.* through spring 2005).

Thereafter, Plaintiff hired Raub to repair water damage, finish roofing, and fix the problems with the Addition that had been identified by the Building Inspector. Raub fixed the violations identified by the Building Inspector and made the Addition weather tight. (*See* Ex. F–7 at unnumbered 4.) Rocco Bowell ("Bowell") from Raub testified about the remedial measures Raub took to correct the problems with the Addition. Although it appears Plaintiff incurred additional costs to correct the violations identified by the Building Inspector, Bowell testified that the cost difference between doing the construction work according to the Niles City Building Code and the way Debtor did the construction work was not significant and, in some instances, was minimal. (*See generally* Tr. from 10:31:56–10:35:19.)

### III. ANALYSIS

Section 523(a)(2)(A) provides that a Chapter 7 discharge does not discharge an individual from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C.

chased (as opposed to leased, rented or borrowed) the car in question. It is worth noting that Debtor's wife does not owe Plaintiff any money and she is not a defendant in this Adversary Proceeding. The only evidence about the car was Plaintiff's observation that

Debtor's wife drove an allegedly new red car to Plaintiff's house shortly after the 1st Payment was made. The record is devoid of any evidence that Debtor used any money from Plaintiff to purchase a new car or in any manner other than to construct the Addition.

§ 523(a)(2)(A) (LexisNexis 2009). A creditor must prove four elements by a preponderance of the evidence to except a debt from discharge under § 523(a)(2)(A):

> (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*Rembert v. AT & T Universal Card Services, Inc. (In re Rembert),* 141 F.3d 277, 280–81 (6th Cir.1998). The debtor's intent to deceive a creditor is determined under a subjective standard. *Id.* at 281.

Plaintiff argues that: (1) Debtor misrepresented to Plaintiff (a) his ability to perform the work necessary to complete the Addition, and (b) his intention to use the money received from Plaintiff to perform the construction work; (2) Debtor intended to deceive Plaintiff with his misrepresentations; (3) Plaintiff justifiably relied on Debtor's misrepresentations; and (4) Plaintiff's reliance caused her loss.

Debtor asserts (1) he made no misrepresentations because he was fully capable of performing the construction work, and (2) he had no intent to defraud Plaintiff when he accepted money for construction work on the Addition. Debtor asserts that he stopped working on the Addition because Plaintiff failed to pay him for the installation of the driveway and fence, which was work outside the scope of the Contract.

## A. Did Debtor Make a Material Misrepresentation?

The first element under § 523(a)(2)(A) that Plaintiff must prove is that Debtor made a false representation or a misrepresentation. "To prevail on a claim under § 523(a)(2)(A) based on false representation, a plaintiff must establish each of the elements listed by the Sixth Circuit in *Rembert,* including an *actual misrepresentation by the debtor.*" *Schafer v. Rapp (In re Rapp),* 375 B.R. 421, 433 (Bankr. S.D.Ohio 2007) (emphasis added). Plaintiff asserts that Debtor made two actual material misrepresentations, as follows: (i) Debtor had the ability to complete the Addition, and (ii) Debtor would use the 1st Payment in accordance with the written notation on page 2 of the Contract.

### 1. Ability

Plaintiff alleged during the course of the trial and in her Complaint that Debtor represented to her that he had the ability to complete the Addition. Plaintiff's Complaint alleges the following:

> Defendant expressly and impliedly represented, warranted and guaranteed the Plaintiff that he was qualified, experienced and able to provide the materials, labor, work and services called for under the contractual arrangement and that he would provide such labor, materials, work and services in a timely and good and workmanlike manner and in accordance with all industry standards and specifications applicable to the renovation of the residence.

(Compl.¶ 8.) [10] Plaintiff argued at trial that the violations found by the Building Inspector during his November 14, 2003, inspection show that Debtor misrepresented his ability to complete the Addition. Debtor maintained throughout the course of the trial that he at all times was ready, willing and able to complete the Addition.

Plaintiff failed to show any express written representation from Debtor to Plaintiff regarding his ability to complete the work

---

**10.** These same allegations were made by Plaintiff in the State Court litigation.

on the Addition. The Contract is devoid of any representations, warranties or guarantees concerning Debtor's experience, qualifications and/or his ability to provide materials, labor, work and/or services nor does it contain *any* written warranties, representations or guarantees whatsoever. The Contract does not reference industry standards or, indeed, any standards pursuant to which Debtor would construct the Addition. Moreover, the Contract does not contemplate any time frame for completion of the Addition, although Plaintiff testified that Debtor told her, and she accepted, that it would take between six and twenty-four months for Debtor to finish the Addition.

Accordingly, because there are no express written representations in the Contract, Plaintiff must establish that Debtor made an oral misrepresentation regarding his qualifications, experience and/or ability to complete the Addition. Plaintiff testified that she relied on Debtor's skill to construct the Addition based upon their friendship and examples of remodeling work Debtor had done at his own residence. Plaintiff stated that Debtor (i) told her he had "been doing construction for quite a while," (Tr. at 10:59:33), and (ii) showed her examples of his work, including a kitchen that he had remodeled, (Tr. at 11:00:04). This is the totality of Plaintiff's testimony about Debtor's representations to her about his experience, qualifications and/or ability to complete the Addition. Other than Debtor's general statement about his experience, Plaintiff failed to identify *any actual* oral representation Debtor made about his skill or his ability to perform the construction work on the Addition.

As a consequence, this Court finds that Plaintiff has failed to establish that Debtor made any actual express representation, warranty or guaranty that he was "quali-

fied, experienced and able to provide the materials, labor, work and services called for under the [Contract] and[ /or] that he would provide such labor, materials, work and services in a timely and good and workmanlike manner and in accordance with all industry standards and specifications applicable to the renovation of the residence." (Compl.¶ 8.)

■ Moreover, the violations of the Niles City Building Code found by the Building Inspector after Debtor had left the job do not indicate that Debtor was incapable of completing the work on the Addition. As both parties agree, the inspection occurred before construction on the Addition was completed. Debtor was not given the opportunity to correct the violations noted in the November 14, 2003, inspection report, and Plaintiff presented no evidence to demonstrate that Debtor lacked the requisite experience, qualifications and/or skill to correct the violations. As a consequence, Plaintiff failed to present any evidence that Debtor misrepresented his ability to complete the Addition.

The instant case is similar to *Jeffries v. Osborne (In re Osborne),* 2009 WL 5195768, 2009 Bankr.LEXIS 4039 (Bankr. N.D.W.Va.2009). In *Jeffries,* the debtor was hired to build a two story addition and deck to the plaintiff's home. Debtor began construction, but stopped without completing the project due to winter weather. At the time construction stopped, plaintiff had paid the debtor $29,550.99 of the total contract price of $40,918.30. Before debtor could return in the spring to complete the work, as promised, plaintiff sued him in state court. The state court lawsuit was in mediation at the time debtor filed for protection under the Bankruptcy Code. Similar to the instant case, the *Jeffries* plaintiff alleged, among other things, that the debt owing to her should not be discharged under § 523(a)(2)(A) because the

debtor had "defrauded her into paying him money for work that was not completed or not completed properly" and that he had "misrepresented his ability to perform the work promised in their contract[.]" *Id.* 2009 WL 5195768, *3, 2009 Bankr.LEXIS 4039 at *8. The bankruptcy court found that plaintiff failed to show that the debtor made a false representation concerning his ability to complete the job, noting that the debtor had been licensed as a contractor for 15 years without suspension or revocation. The court concluded, "Based on the Debtor's license and past experience, no basis exists in the record to conclude that the Debtor misrepresented his ability to complete Ms. Jeffries's construction project." *Id.,* 2009 WL 5195768, *4, 2009 Bankr.LEXIS 4039 at *11.

Like the facts in the *Jeffries* case, the record here is devoid of any basis to conclude that Debtor misrepresented his ability, skill or experience. As set forth above, this Court finds that Plaintiff failed to establish that Debtor made any actual representations about such matters. Assuming, *arguendo,* that Debtor did make a representation about his ability, skill and/or experience, the examples of Debtors' remodeling work and his statement that he had been doing construction for quite a while support Debtor's position that he had the qualifications, ability, skill and experience to complete the Addition. The record in this case does not support a finding that Debtor misrepresented his qualifications, ability, skill and/or experience regarding construction of the Addition.

Plaintiff's Complaint references implied as well as express representations and warranties. Although a breach of contract action may be based upon an implied representation, § 523(a)(2)(A) requires Plaintiff to show that Debtor made an *actual* representation that was false. *Rapp,* 375

B.R. at 433. "A finding that a debt is non-dischargeable under 523(a)(2)(A) requires a showing of actual or positive fraud, not merely fraud implied by law[.]" *Rembert,* 141 F.3d at 281, (*quoting Anastas v. American Sav. Bank (In re Anastas),* 94 F.3d 1280, 1286 (9th Cir.1996)). Thus, this Court finds Plaintiff's allegations regarding implied representations and/or warranties regarding Debtor's qualifications, ability, experience, skill and/or workmanship to be insufficient to support a cause of action under 11 U.S.C. § 523(a)(2)(A).

### 2. 1st Payment

■ Plaintiff testified at trial that Debtor represented he would use the 1st Payment to purchase specific building materials for the Addition, but that such representation was false because he failed to purchase all of those materials. Plaintiff contends that, because Debtor never delivered the siding, doors or windows for the Addition to her residence, Debtor made a material misrepresentation that supports nondischargeability of the Judgment Debt.

Debtor testified that the windows had been ordered and were being held at a warehouse, but the doors and siding had not yet been ordered because construction of the Addition had not progressed to a point where such materials were necessary. However, Debtor's main contention seems to be that because he was not paid for the installation of the driveway, he stopped work on the Addition before he had the opportunity to complete the work under the 1st Payment.

Plaintiff contends the Contract contains Debtor's representation that he would use the 1st Payment for: (i) a spiral staircase, (ii) a garage door, (iii) siding, (iv) windows, (v) doors, (vi) trusses, and (vii) the start of construction. (*See* Contract at 2.) However, Plaintiff failed to show that Debtor did

not intend to use the 1st Payment for these purposes at the time he wrote up the Contract. In fact, the testimony at trial showed that Debtor used the 1st Payment consistent with the Contract.

First, Plaintiff testified that she eliminated the spiral staircase from the Addition. (Tr. 10:57:58; see also Contract at 1 (showing Plaintiff's "2 or no" next to "spiral staircase to 2nd floor").) Next, there is no dispute that Debtor more than "started" construction on the Addition and, indeed, had partially completed two floors, the garage, and a roof over the family room when he stopped working on the Addition. The Building Inspector specifically found that the garage door and trusses were in place, even though there were certain deficiencies with these items. And although Plaintiff contended it was a lie, Debtor testified that he had put a deposit down for the windows, which were being stored in a warehouse. Accordingly, the only items included in the 1st Payment that were not accounted for were the siding and doors.

Debtor testified that, because of requests from Plaintiff, he did work that was outside of the scope of the 1st Payment. It is undisputed that Debtor completed concrete work, which was anticipated to be encompassed in the "2nd payment," and the "concrete drive for camper and van," which was listed as "additional work." (See Contract at 2–3.) Contrary to Plaintiff's testimony that the driveway costs should have come out of the 1st Payment (Tr. at 11:29:44), the only reference in the Contract to "concrete work" is in connection with the "2nd payment" of $14,000, which Plaintiff never paid to Debtor. As a consequence, this Court finds that Debtor performed work on the Addition that was

outside the scope of the 1st Payment prior to completion of the 1st Payment work.[11]

Debtor stopped working on the Addition after he was not paid for his work on the driveway. Plaintiff failed to show any evidence that, prior to such time, Debtor did not intend to complete all work contemplated within the 1st Payment. Moreover, Plaintiff failed to offer any evidence that Debtor made a material misrepresentation in connection with obtaining the 1st Payment.

This Court finds that the writing on page 2 of the Contract does not constitute an actual representation about how Debtor would use the monies advanced in the 1st Payment. Even assuming, *arguendo*, that the writing on page 2 of the Contract could be deemed to be a representation regarding how Debtor would use this money, it is clear that he purchased some—if not most—of the materials listed therein, began construction on the Addition, and, in fact, performed additional work not covered by the Contract. As a consequence, even if the language on page two in connection with the 1st payment is deemed to be an actual representation, such language is not a material misrepresentation and cannot support a cause of action under § 523(a)(2)(A).

The instant case is distinguishable from *Whitaker v. Koenig*, 418 B.R. 265 (E.D.Tenn.2009), where a debt based on the debtor's failure to complete a residential contract was held to be non-dischargeable. In *Whitaker*, the debtor's construction corporation entered into a contract to construct a residence for appellees, who made an initial payment of $60,000.00 to debtor pursuant to the contract. The debtor then requested a second payment of $60,000.00. The court found that it was

11. Indeed, construction of the concrete drive for the camper and van was outside the scope of the Contract, but Debtor completed such work at Plaintiff's request.

"undisputed and, in fact, stipulated" that [the debtor] represented to appellees the purpose of the [second] $ 60,000.00 payment.... Paragraph 4 of the parties' stipulation agreement indicates that [debtor] told appellees that "there were large upcoming expenses" and that he "needed the monies to pay for materials and/or to pay subcontractors" on appellees' project.

*Id.* at 272. Instead of paying expenses on appellees' construction project, the debtor deposited the second payment into an unsegregated account from which payments were made relating to other construction projects. The court found that appellees established the first element of their cause of action under § 523(a)(2)(A) because the debtor "obtained the [second] $60,000.00 . . . payment from appellees by representing to them that [the debtor] intended to use that $60, 000. 00 for expenses related to [their] project, when in fact [the debtor] knew that he planned to use that $60,000.00 to pay expenses wholly unrelated to appellees' project." *Id.* The instant case is distinguishable from *Whitaker* because the parties here did not stipulate that Debtor represented to Plaintiff that any payment would be used for any particular purpose. Not only did the parties fail to stipulate to this fact, Plaintiff failed to adduce any evidence that Debtor made any kind of representation concerning how he would use the money Plaintiff advanced to Debtor. Moreover, Plaintiff failed to introduce any evidence that the payments to Debtor were not used for and/or in connection with constructing the Addition and/or the additional work requested by Plaintiff.

### B. Other Elements For Section 523(a)(2)(A) Action

Plaintiff has failed to establish the first and essential element of a non-dischargeability action based on false representation—*i.e.,* that Debtor made an actual mis-representation or a false representation to her. As a consequence, it is not necessary—or even possible—for the Court to analyze the other elements of this cause of action. Without an actual misrepresentation, there can be no intent to deceive, no justifiable reliance and no proximate loss.

■ The Court notes, however, that even assuming, *arguendo,* that Plaintiff could show an actual misrepresentation concerning the 1st Payment, such misrepresentation would be limited to the amount of the 1st Payment (*i.e.,* $23,800.00) rather than the entire Judgment Debt. Because the Judgment Debt is based on breach of contract, it need not—and in the instant case, is not—coextensive with the amount of money Debtor "obtained." The record is totally devoid of any evidence that Debtor "obtained" the amount of the Judgment Debt, as required by § 523(a)(2)(A).

### IV. CONCLUSION

For the reasons stated above, the Court finds that Plaintiff failed to show Debtor made an actual material misrepresentation to Plaintiff. Because Plaintiff failed to show that the Judgment Debt is non-dischargeable under § 523(a)(2)(A), the Judgment Debt is dischargeable.

An appropriate order will follow.

### ORDER REGARDING TRIAL

This cause is before the Court after trial in the instant Adversary Proceeding on February 8, 2010. On July 22, 2008, Plaintiff Karen Owen ("Plaintiff") timely filed Complaint to Determine Dischargeability of Debt (Doc. # 1), which sought to exempt from discharge a debt in the amount of $89,351.00 ("Judgment Debt") based on a judgment against Debtor/Defendant Thomas Arthur Angst ("Debtor") in Trumbull County Court of Common Pleas, Case No.2004 CV 948, dated May 11, 2005.

For the reasons stated in the Court's Memorandum Opinion Concerning Trial entered this date, the Court finds that Plaintiff failed to show Debtor made an actual material misrepresentation to Plaintiff. Because Plaintiff failed to show that the Judgment Debt is non-dischargeable under § 523(a)(2)(A), the Judgment Debt is dischargeable.